[Crim. No. 842.  Second Appellate District, Division One.—February 14, 1922.]

## THE PEOPLE, Respondent, v. T. T. CONDLEY, Appellant.

[1] CRIMINAL LAW — MURDER — SYMPATHY—INSTRUCTIONS—APPEAL.— In a prosecution for murder, the act of the trial court in prefacing an instruction to the jury that its judgment should not be directed by sympathy "nor by revenge" with the statement: "Arguments have been made tending to arouse your sympathy," does not constitute the expression the view of the court on a question of fact; and such instruction, if otherwise correct, will not be held erroneous because of such statement, but the appellate court will assume that arguments tending to arouse sympathy had been made.

APPEAL from a judgment of the Superior Court of Tulare County.  J. A. Allen, Judge.  Affirmed.

The facts are stated in the opinion of the court.

Gallaher & Simpson and Farnsworth, McClure & Burke for Appellant.

U. S. Webb, Attorney-General, and Arthur Keetch, Deputy Attorney-General, for Respondent.

JAMES, J.—Defendant was charged with the crime of murder. The jury returned a verdict finding him guilty of manslaughter. He appeals from the judgment of imprisonment and from an order made denying his motion for a new trial.

The information of the district attorney charged that defendant, on or about the sixth day of March, 1921, in the county of Tulare, with malice aforethought, killed Joseph Silva.

A brief summary of the evidence, gathered from the quite voluminous record presented, is all that will be necessary to be made in order to properly present the contentions of appellant. The deceased's wife was the mother of the wife of appellant. Silva was her second husband, she having been divorced from the father of Mrs. Condley. The Condleys had been married about twelve years and had four children, the eldest of whom was, at the time of the trial, of the age of ten years. Appellant had not lived happily with his wife during the year or so preceding the tragedy, and blamed his mother-in-law, Mrs. Silva, for, as he insisted, having tried to influence his wife against him. The Silvas and appellant lived near the town of Lindsay on ranches located in close proximity to each other. On the fifth day of March, 1921, appellant's wife took the four children and went with her mother and Silva to the city of Hanford, where there resided Mrs. Jones, who was a sister of Mrs. Condley and daughter of Mrs. Silva. Appellant remonstrated with his wife about going away that day and also, as he testified, expressed his objection to his mother-in-law. Nevertheless, Mrs. Condley refused to remain in appellant's house and departed with her mother and Silva. On the way to Hanford they stopped at a lawyer's office, where some consultation was had regarding the marital difficulties of appellant and his wife. After leaving Mrs. Cond-

56 Cal. App.—27

ley and the children at the house of Mrs. Jones at Hanford, the Silvas, in the afternoon of the same day, returned to their home. On the same afternoon appellant drove to Hanford and discovered the whereabouts of his wife and children. He went to the Jones house. Mrs. Jones refused to admit him, telling him he could talk to his wife through the screen door, which he did. Mrs. Jones testified that in the conversation which ensued between appellant and his wife the latter refused to return to her home and announced that she would not live with appellant again, that she was going to get a divorce. Upon the arrival of the husband of Mrs. Jones, appellant was admitted into the house, where he sat and talked for a time. He stated in his testimony that his wife advised him that she was going to stay there with Mrs. Jones for two or three days; that he had told her that he was going to see a police officer and find out whether he could not take the children home, but that he finally left and went to the home of Mrs. Dodds, an aunt of his wife's who resided near the town of Hanford. Mrs. Dodds was the sister of Mrs. Condley's father, and her father was at that time living with her at her house. Besides Mrs. Dodds, her husband and brother, there were three young daughters in the Dodds household. Appellant presented to the members of the Dodds family a perturbed appearance and talked a great deal about his domestic difficulties. At least four members of the family testified that he said, referring to Mr. and Mrs. Silva, that if they bothered him he was going to get them both. He was advised, according to the testimony, by Mrs. Dodds' brother that he shouldn't feel that way, that it would "only get him in bad," to which he replied, "I don't only feel that way but I will do it." In a further talk with the Dodds family, when he was advised that if he couldn't get along with his wife he had better stay away from her, appellant asserted that he might go east. Upon leaving the house the following morning he said, in response to an invitation to come back before he went away, that he might come back or he might not come back at all. By his own admission appellant knew that the Silvas had started for their home on the afternoon of the 5th of March; he knew that they were not at the Jones house during the time that he was there, and his wife had declared to him that she intended to stay at the Jones' for two or three

days. The evidence discloses, however, that after leaving the
Dodds house on March 6th he returned to his ranch. He tes-
tified that upon arriving there he did some chores, such
as feeding the chickens. The Silvas were engaged in oper-
ating a small slaughter-house which was located not far from
their home. They were at work there on the 6th of March,
having secured a pig from a neighboring place, which it was
evident they intended to kill. The slaughter-house was not
a large building, but on the outside of it was kept a
cauldron used for the purpose of heating water. Defendant
testified that, after performing the small duties about his
place, as indicated, he went over to the house of a Japanese
neighbor to borrow some cartridges to use in a shotgun for
the purpose of killing a small female dog which, he said, was
running about. He testified that he procured two cartridges
from the ''Jap,'' returned and secured his gun; that he
had one brass cartridge loaded besides these two that he
borrowed; that he put the gun in the back of his automobile
truck and drove around looking for the dog which had by
that time gone away; he testified that he drove over to the
Silva house and found no one there and that he then drove
to the slaughter-house where Mr. and Mrs. Silva were; he
testified that his purpose in going there was to ascertain
whether his wife had not come home with the Silvas (this
notwithstanding that he had seen his wife at the Jones place
in Hanford and that she had declared to him her intention
to stay with Mrs. Jones for several days; and that he knew
also that the Silvas had returned to their home on the
afternoon of the 5th). His testimony further was that he
stopped his machine near the slaughter-house; that Mrs.
Silva was at work at about the place where the cauldron was,
outside of the building; that he alighted from his autotruck
without taking the gun and asked Mrs. Silva whether his
wife was there, to which she replied ''No,'' and that he had
said to her that he thought she might have his wife hidden
somewhere about the premises and that he was going to
see; that Mrs. Silva advanced upon him with a cleaver and
addressed him with a threat and told him to get out; that
her husband appeared in view at or near the door of the
slaughter-house; that he too threatened the appellant and
started to move in a direction as though to secure a weapon;
that he (appellant) retreated to his autotruck upon the ad-

vance of Mrs. Silva with the cleaver and picked up his gun, discharged it at her body, and immediately fired a second shot at Silva; that Silva "staggered or dropped down" behind the boarding and that Mrs. Silva fell to the ground; that, fearing that Silva was procuring a weapon which appellant believed he had on the premises, appellant returned to his automobile, got the third cartridge and inserted it in his gun and moved around toward the building within which Silva was, sheltering himself in part by a tree that was there; that he approached to where he could discern Silva, who, he said, was "kind of hunkered down"; that he immediately fired the third shot, which shot entered the body of Silva, after receiving which the latter fell. An eye-witness, a young man who observed the shooting from a point not far away, testified that appellant did not return to his automobile for the gun after meeting Mrs. Silva, but that he had the gun with him at the time he left the vehicle. In the slaughter-house, on the opposite side from where the body of Silva was found, was a rusty 22-caliber rifle. About six feet away from the body of Silva, wrapped in a cloth of some sort and lying on the floor, was a revolver of large caliber, the chambers of which were loaded. There was testimony tending to show that Mrs. Silva, after seeing appellant that morning, had brought the parcel containing the larger gun from her home. The inference which the prosecution evidently sought to draw from this circumstance was that, having observed the presence of appellant, and fearing that he might make an attack upon her or her husband, she had carried the gun to the place where the two were at work and, under the testimony introduced by the people, that inference was both plausible and reasonable.

Appellant, after completing the killing of the two Silvas, drove to the sheriff's office and gave himself up. His defense rested solely upon the claim that the shooting of the two persons was done by him as acts of necessary self-defense. There was testimony to the effect that certain threats made by Mrs. Silva and her husband, wherein they declared that they would kill appellant, were communicated to appellant prior to March the 6th. There was testimony of an occurrence when some dispute arose between Mrs. Silva and appellant, the former had seized a small butcher-knife and had started toward appellant, when her husband in-

terfered and took her home. The threats reported to have been made by Mrs. Silva against the life of the defendant were coupled with a condition, to wit, that if he struck her daughter Addie (his wife) she would execute the reported design. That the evidence was sufficient to sustain the verdict we find no question made in the brief of counsel for appellant, and we are constrained to say that, had the verdict in this case been that of first degree murder, it would have been fully sustained by the proof.

The contentions urged upon this appeal are referable solely to instructions given by the court and to others which were offered by the defendant and refused. We find upon an examination of the charge as the court delivered it to the jury that there was expressed by the trial judge a very full and correct exposition of the law of self-defense. The jury was carefully advised as to the right of a person who is attacked or threatened with great bodily injury at the hands of another, to defend himself and use a deadly weapon in the prosecution of that defense; it was advised fully as to the right of such a person, using reasonable judgment, to act upon appearances and to be justified in the use of a deadly weapon, even though it might appear that the danger was not in fact real; the instructions were full to the point as to the right of the person attacked or threatened to not only kill his assailant, but to pursue him where it appears that the danger to him might be increased by retreat; they correctly advised the jury as to the right of the defendant, in judging of the danger in which he was placed, to take into consideration threats made by the deceased. All of these features of the law touching the right of persons in the situation of the defendant were presented with ample elaboration, and we find no point necessary for the guidance of the jury which was not fairly included within the instructions as given. (*People* v. *Hecker,* 109 Cal. 451 [30 L. R. A. 403, 42 Pac. 307].) Holding this view, we think it unnecessary to enter upon a discussion of particular phases of the instructions given, or of the applicability of those which were offered by the defendant and refused by the court.

[1] Appellant particularly complains because the court prefaced one instruction with this statement: "Arguments have been made tending to arouse your sympathy." The in-

struction proceeded to advise the jury that its judgment should not be directed by sympathy "nor by revenge." Counsel does not question the correctness of the statements of the court as contained in the body of the instruction, but argues that the preliminary sentence which we have quoted expressed the view of the court on a question of fact. We cannot deduce any such conclusion from that language. The court was evidently referring to the argument of some counsel, whether on one or both sides of the case we are not told. No part of the argument is presented. If, during the course of the arguments, an appeal had been made to the sympathies of the jury by either counsel the trial judge would have been well within the line of his duty had he interrupted the argument and instructed the jury to disregard any such appeal. He had the same right to repeat in the final charge a caution to the jury to decide the case upon the law and the facts and not be influenced by the bias of sympathy or prejudice. If the clause of the instruction quoted indicates the intention of the court to express to the jury his knowledge as to the fact that arguments tending to arouse sympathy had been made, we will assume the fact to be as stated by the court. There was no error in the giving of any part of the instruction referred to.

A careful examination of the record has convinced us that there is no substantial merit in the appeal taken by the defendant. His conviction of the crime of manslaughter must be said to rest upon abundant proof. The case is one which makes pertinent the observation of the supreme court used in the case of *People* v. *Cebulla,* 137 Cal. 314 [70 Pac. 181], where it was said that the defendant should be considered fortunate that the jury reduced the crime to that of such small degree.

The judgment and order are affirmed.

Conrey, P. J., and Shaw, J., concurred.